IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KEVIN HENDERSON, et al.,
    Plaintiffs,

v.                                              Civil No. 3:25-cv-1027

OFFICER A.M. BELCHER,
et al.,
    Defendants.

### MEMORANDUM OPINION

On February 3, 2026, Kevin Henderson and Sukari Henderson (collectively, "Plaintiffs"),[1] filed their FIRST AMENDED COMPLAINT (ECF No. 22) (the "First Amended Complaint") against Officer A.M. Belcher, Officer M.R. McCarthy, and Officer D.A. Ojibway (collectively, "Defendants"). On February 13, 2026, Defendants filed their MOTION TO DISMISS THE FIRST AMENDED COMPLAINT (ECF No. 26) (the "Motion to Dismiss"). Having been fully briefed, the Defendants' Motion to Dismiss is ripe for review. The Court dispensed with oral argument because the materials before it adequately presented the facts and legal contentions, and argument would not have aided the decisional process. For the reasons set forth below, the Defendants' Motion to Dismiss (ECF No. 26) was granted by ORDER (ECF No. 61).

---

[1] To avoid any potential confusion arising from the shared surname of Kevin Henderson and his daughter, Sukari Henderson, the Court refers to Kevin Henderson as "Kevin," and to Sukari Henderson as "Sukari."

## I. BACKGROUND

### A. Procedural Background

On December 17, 2025, Plaintiffs filed their initial COMPLAINT (ECF No. 1), and on February 3, 2026, Plaintiffs filed their FIRST AMENDED COMPLAINT (ECF No. 22). COUNT I alleges a violation of Kevin's Fourth Amendment rights, by virtue of excessive force, against Officers Belcher and McCarthy. COUNT II alleges a violation of Kevin's Fourth Amendment rights, by virtue of unreasonable detention, against all Defendants. COUNT III alleges a violation of Sukari's Fourth Amendment rights, by virtue of excessive force, against Officers Belcher and McCarthy. COUNT IV alleges a violation of Sukari's Fourteenth Amendment rights, by virtue of denial of her right to substantive due process, against all Defendants. COUNTS I through IV are brought through 42 U.S.C. § 1983, which authorizes suit in federal court for violations of federal, constitutional, or statutory rights. COUNT V alleges a state law claim for gross negligence on behalf of Sukari against all Defendants. On February 13, 2026, Defendants filed their Motion to Dismiss (ECF No. 26), asserting qualified immunity as a defense to COUNTS I through IV of the First Amended Complaint.

2

**B. Factual Background**

**1. *Introduction of Body-Worn Camera Footage***

*i. Legal Standard*

In Doriety v. Sletten, the Fourth Circuit held that a district court may consider a video recording submitted at the motion to dismiss stage, without converting the motion to one for summary judgment, "when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." 109 F.4th 670, 679-80 (quoting Saalim v. Walmart, Inc., 97 F.4th 995, 1002 (6th Cir. 2024)). "As the phrase 'blatantly contradicts' implies, '[t]his standard is a very difficult one to satisfy' and requires that the plaintiff's version of events be 'utterly discredited' by the video recording." Doriety, 109 F.4th at 679 (quoting Lewis v. Caraballo, 98 F.4th 521, 529 (4th Cir. 2024)) (internal quotation marks omitted).

*ii. Integral Nature of the Body-Worn Camera Footage*

The first step of the Doriety test requires a determination of whether the body-worn camera ("BWC") footage recorded by Officers McCarthy (ECF No. 27-2) and Belcher (ECF No. 27-3) respectively is "integral" to the First Amended Complaint. Doriety, 109 F.4th at 679-80.

The only direct references in the First Amended Complaint to the BWC footage appear in paragraphs 24 and 50, where Plaintiffs allege that "Defendant Ojibway told the other officers that Plaintiff Kevin Henderson fired his weapon, which is an untrue statement, as the body-warn [sic] camera footage clearly shows." ECF No. 22 at ¶¶ 24, 50 (emphasis added). This allegation clearly demonstrates that Plaintiffs were in some capacity relying on BWC footage; however, upon careful review of the BWC footage submitted in support of Defendants' Motion to Dismiss (ECF No. 27-2, 27-3), this statement by Officer Ojibway is not depicted in the submitted footage.[2] In turn, this reference alone does not render the submitted BWC footage "integral" to the First Amended Complaint.

Plaintiffs, in their First Amended Complaint, also allege facts regarding the relative positioning of Officers Ojibway and McCarthy as they approached the apartment door. See ECF No. 22 at ¶ 14. As the Sixth Circuit held in Saalim:

> where a complaint even 'implicitly relies on a video' it can make sense to consider it even at an early stage of litigation. This is particularly true when determining whether qualified immunity applies, as qualified immunity is a complete defense to not just liability, but to litigating the suit itself, making early resolution central to the protection it offers.

---

[2] It is possible that Plaintiffs are relying on a portion of the BWC footage from the incident not currently before the Court at the Motion to Dismiss stage.

4

97 F.4th at 1002 (internal citation omitted). Here, the Court finds that Plaintiffs implicitly relied on the BWC footage in support of their allegations respecting the relative positioning of Officers Ojibway and McCarthy as they approached the apartment door.

Accordingly, the Court now finds the BWC footage of Officers McCarthy and Belcher (ECF No. 27-2, 27-3) is "integral" to the First Amended Complaint and the BWC footage can be considered in resolving the Motion to Dismiss.[3]

    *iii. Blatant Contradictions Between the First Amended Complaint and the Body-Worn Camera Footage*

Having found the BWC footage sufficiently "integral" to the First Amended Complaint, under <u>Doriety</u>, the BWC footage may be considered only insofar as it "blatantly contradicts" the allegations made in the First Amended Complaint. <u>Doriety</u>, 109 F.4th at 679-80. A comparison between the BWC footage of Officers McCarthy (ECF No. 27-2) and Belcher (ECF No. 27-3) and the First Amended Complaint (ECF No. 22) reveals two blatant contradictions.

In paragraph 31 of the First Amended Complaint, Plaintiffs allege that "Kevin Henderson . . . posed no immediate threat to the officers or any other person when Officers Belcher and McCarthy discharged their weapons at him." ECF No. 22 at ¶ 31. The BWC

---

[3] Notably, Plaintiffs do not contest in their Memorandum in Opposition to the Motion to Dismiss that the BWC footage is integral to the First Amended Complaint. <u>See</u> ECF No. 30.

footage blatantly contradicts that assertion. The officers were dealing with an individual who opened his apartment door with a firearm drawn and held at eye level. The mere fact that Kevin appeared to somewhat lower the firearm and began backing out of and closing the apartment door does not negate the immediate threat that he continued to pose to the officers, especially given the rapidly evolving nature of the encounter and the reality that circumstances can change in a split second.

In paragraph 73 of the First Amended Complaint, Plaintiffs allege that "Defendants Belcher and McCarthy intended to cause harm to Plaintiff Sukari Henderson . . . and other occupants of 623 Shawn Court when they discharged their firearms into the apartment door." ECF No. 22 at ¶ 73. The BWC footage blatantly contradicts that assertion. The BWC footage clearly depicts Officers Belcher and McCarthy discharging their firearms into the apartment door in response to Kevin, who had moments before opened the door to his apartment and displayed a raised firearm pointed in the general direction of the officers. The BWC footage clearly demonstrates that Officers Belcher and McCarthy discharged their firearms in an effort to subdue only Kevin, not Sukari or any other occupants of 623 Shawn Court. In fact, the BWC footage reflects that the only individual the officers saw was Kevin; the officers had no specific knowledge as to the precise location of Sukari or any other occupants of 623 Shawn Court.

6

## 2. Facts

On December 29, 2023, at approximately 3:38 A.M., Henrico County Uniform Patrol Officers were dispatched to 113 Quinby Court in response to a "Code 2" domestic situation. ECF No. 22 at ¶ 9. While en route to the scene, the call was upgraded to a "Code 3" after receiving reports that a female, Sukari Henderson, had been shot at 113 Quinby Court. ECF No. 22 at ¶¶ 10-11.

Dashawn Vaughn, one of the individuals who called 911 to report the gunshot, informed the 911 operator that Sukari Henderson had left on foot and directed officers to her father's apartment located at 623 Shawn Court, where Dashawn believed that Sukari was headed. ECF No. 22 at ¶ 12. Officers Ojibway, McCarthy, and Belcher responded to the 623 Shawn Court address. ECF No. 22 at ¶ 13. Upon arriving at the 623 Shawn Court address, Officer Ojibway, closely followed by Officer McCarthy, approached the apartment and knocked loudly on the door. ECF No. 22 at ¶ 14. Officer Ojibway did not announce that he was a police officer. ECF No. 22 at ¶ 15.

After Officer Ojibway knocked and stepped away from the doorway, Kevin Henderson, believing that the person knocking on his door was the individual who had shot his daughter, Sukari, and fearing for his daughter's safety as well as his own, partially opened the door and displayed a raised firearm in his left hand. ECF No. 22 at ¶ 16. As Kevin lowered the firearm and began backing away from and closing the apartment door, Officers Belcher and

7

McCarthy fired their weapons at Kevin. ECF No. 22 at ¶ 17. The officers' gunfire barely missed Kevin and grazed Sukari. ECF No. 22 at ¶ 18.

After determining that the sound of gunfire had ceased, Kevin exited his home unarmed and was subsequently detained by the officers on scene. ECF No. 22 at ¶ 20. Kevin was immediately placed in handcuffs and detained in the back of a police squad car by Officers Ojibway and McCarthy. ECF No. 22 at ¶ 21. Kevin remained confined in the police car for multiple hours. ECF No. 22 at ¶ 22. Sukari was later taken to MCV Hospital, where she was treated for the gunshot wound from the original assailant and for the injuries caused by Officers Belcher and McCarthy. ECF No. 22 at ¶ 25.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court "must accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018). The plaintiff need not provide "detailed factual allegations," Twombly, 550 U.S. at 555, but must provide enough factual context so the court can draw reasonable inferences that there is "more

8

than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. Legal conclusions, a bare recitation of the elements of a claim, and "naked assertions devoid of further factual enhancement" are insufficient. Id. (quoting Twombly, 550 U.S. at 555, 557).

Factual allegations—but not legal conclusions—are accepted as true for the purpose of evaluating the motion. Twombly, 550 U.S. at 555. If the alleged facts make clear that, as a matter of law, "no relief could be granted under any set of facts that could be proved consistent with the allegations," the court can dismiss the claims. Neitzke v. Williams, 490 U.S. 319, 326-27 (1989) (quotations omitted). Video submitted at the motion to dismiss stage (here, the BWC footage) can be considered "when (1) the video is 'integral' to the complaint and its authenticity is not challenged, but (2) only to the extent that the video 'clearly depicts a set of facts contrary to those alleged in the complaint,' or 'blatantly contradicts' the plaintiff's allegations, rendering the plaintiff's allegations implausible." Doriety, 109 F.4th at 679-80 (quoting Saalim, 97 F.4th at 1002).

### III. Analysis

A. Qualified Immunity Defense to Counts I Through IV

As to COUNTS I through IV of the First Amended Complaint, the Officers, in their Motion to Dismiss, assert qualified immunity as a defense.

9

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001)). Courts apply a two-faceted test to determine whether an officer is entitled to qualified immunity. See Pearson v. Callahan, 555 U.S. 223, 232 (2009). Under the first facet, "a plaintiff must allege sufficient facts to set forth a violation of a constitutional right . . . ." Sims v. Labowitz, 885 F.3d 254, 260 (4th Cir. 2018) (citing Pearson, 555 U.S. at 232). As to the second facet, "the court must conclude that this right was clearly established at the time of the alleged violation." Sims, 885 F.3d at 260. The Court may consider either facet of the test first. See Pearson, 555 U.S. at 236 ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

**1. Count I: Violation of Kevin Henderson's Fourth Amendment Rights, by Virtue of Excessive Force, Against Officers Belcher and McCarthy**

The constitutional violation alleged in COUNT I is that Officers Belcher and McCarthy violated Kevin's Fourth Amendment rights by subjecting him to excessive force when Officers Belcher

10

and McCarthy discharged their firearms multiple times into and around Kevin's apartment. ECF No. 22 at ¶ 34.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. One aspect of the bundle of rights guaranteed by the Fourth Amendment is the right to be free from the use of excessive force when being seized. See Graham v. Connor, 490 U.S. 386, 395 (1989). "To determine whether the force used was excessive, we apply a 'standard of objective reasonableness.'" Putman v. Harris, 66 F.4th 181, 186 (4th Cir. 2023) (quoting Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002)).

In Graham, the Supreme Court created the operative standard for reviewing claims of excessive force brought under the Fourth Amendment, holding that the "test of reasonableness" requires careful attention to the particular facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In addition to the three Graham factors, courts in the Fourth Circuit consider the "extent of the plaintiff's injuries." Nazario v. Gutierrez, 103 F.4th 213, 234 (4th Cir. 2024). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than

11

with 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)). And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

Officers Belcher and McCarthy argue that Kevin's excessive force claim fails the first facet of the qualified immunity test because (1) Kevin was not seized when they fired their weapons at him and (2) even if they did seize Kevin when they fired their weapons, this seizure was reasonable under the Graham factors. See ECF No. 27 at 8-9. In response, Kevin asserts (1) that he was seized "[w]hen Kevin recognized the officers, lowered his firearm, and began backing away from the door in compliance," thereby submitting to the Officers' show of authority and (2) that the force used by Officers Belcher and McCarthy when they chose to fire "multiple rounds at a retreating man who had already submitted to authority" was excessive. See ECF No. 30 at 4-7.

Officers Belcher and McCarthy further argue that Kevin's excessive force claim should be dismissed under the second facet of the qualified immunity test because the constitutional right advanced by Kevin in COUNT I was not clearly established as of December 29, 2023, the date of the incident. Kevin responds that

12

the right to be free from excessive force under the circumstances before the Court has been clearly established by the Fourth Circuit's decisions in Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir. 2005), and Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019). See ECF No. 30 at 5-7. Courts may "address these questions in the order that would best facilitate the fair and efficient disposition of the case." Atkinson v. Godfrey, 100 F.4th 498, 504 (4th Cir. 2024) (citing Pearson, 555 U.S. at 236). That means that courts "may grant qualified immunity on the ground that the purported right was not clearly established without resolving the 'often more difficult question whether the purported right exists at all.'" Atkinson, 100 F.4th at 504 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "The flexibility in approaching the questions 'comports with the Supreme Court's usual reluctance to decide constitutional questions unnecessarily.'" Atkinson, 100 F.4th at 504 (quoting Reichle, 566 U.S. at 664).

i. "Clearly Established" Analysis

Given that the Court may consider either facet of the qualified immunity inquiry first, the analysis will begin with the second facet—whether the constitutional right advanced in COUNT I has been "clearly established." Atkinson, 100 F.4th at 504.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly,

13

580 U.S. 73, 78-79 (2017) (per curiam) (internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam). Although "caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White, 580 U.S. at 79 (alteration and internal quotation marks omitted).

The standard for a clearly established right is heightened in the context of an excessive force claim under the Fourth Amendment. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam) (alteration and internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Id. at 13 (internal quotation marks omitted and emphasis deleted).

When assessing whether a constitutional right has been clearly established, courts "first examine 'cases of controlling

14

authority in [this] jurisdiction,' that is, 'decisions of the Supreme Court, th[e] court of appeals [for the Fourth Circuit], and the highest court of the state in which the case arose.'" Booker v. S.C. Dep't of Corr., 855 F.3d 533, 538 (4th Cir. 2017) (internal citations and quotations omitted). Courts "'ordinarily' need not look any further than decisions from these courts. But when 'there are no such decisions from courts of controlling authority, we may look to a consensus of cases of persuasive authority from other jurisdictions, if such exists.'" Id. at 538-39 (quoting Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004)) (internal citation and quotations omitted). Under these principles, the Court finds that Officers Belcher and McCarthy are entitled to qualified immunity.

Defined at the level of specificity required by the Supreme Court, the question before the Court is whether it was clearly established on December 29, 2023 that shooting at an individual was an unconstitutional use of excessive force when: (1) an officer knocks on the individual's door without announcing that they are with law enforcement; (2) the individual opens the door and displays a raised firearm pointed towards the officers; (3) the individual lowers the firearm and begins backing away from and closing the door; and (4) the officers, having had a gun pointed at them moments before, fire their weapons at the individual. ECF No. 22 at ¶¶ 14-18. Where the clearly established issue is raised,

15

it is the Plaintiff's responsibility to identify authority that clearly establishes the right upon which the claim, defined at the appropriate level of specificity, relies. When comparing the facts of this case to the requisite authority (Fourth Circuit, Supreme Court of the United States, Supreme Court of Virginia, or a consensus of cases of persuasive authority from other jurisdictions) available before December 29, 2023, the Court is unable to find any precedent that clearly establishes the constitutional right asserted by Kevin with the necessary specificity. Mullenix, 577 U.S. at 12.

In his opposition to the Motion to Dismiss, Kevin relies on two Fourth Circuit cases, Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir. 2005), and Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019), to establish that, as of December 29, 2023, existing precedent clearly established that Officers Belcher and McCarthy violated his Fourth Amendment rights when they discharged their firearms multiple times into and around the apartment. However, the facts of those cases do not closely align with the facts alleged in this case. Therefore, neither Turmon nor Betton clearly established the constitutional violation advanced in this case. Mullenix, 577 U.S. at 12 ("[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant

16

legal doctrine, here excessive force, will apply to the factual situation the officer confronts.").

In Turmon, a police officer, having incorrectly identified the steam from a hot shower emitting from the open front door to a motel room as "white smoke" related to a potential fire, rapidly approached the room to investigate. Turmon, 405 F.3d at 203-04. When the motel occupant heard the rapidly approaching footsteps, "he shut the door and got back into bed." Id. at 204. Upon hearing the door close, the officer began to suspect that "the occupant had some improper motive for not wanting him . . . to enter the room." Id. The officer "concluded that the occupant was committing arson, attempting to hurt himself or someone else, or attempting to cover up some other illicit activity occurring inside the room." Id. When the officer finally reached the door, he did not smell smoke or see any signs of a fire, but his suspicions of wrongdoing remained. Id. As a result, the officer "bang[ed] loudly on the door" but did not identify himself as a police officer. Id. After the motel occupant asked who was at his door in response to the knocking, the officer replied that it was the sheriff's department and demanded the occupant open the door. Id. When the occupant opened the door, the officer pointed his gun at the occupant's face. Id. The occupant immediately raised his hands and asked why the officer's weapon was drawn. Id. Without saying anything, the officer grabbed the occupant and jerked him outside into the

17

walkway. Id. The officer then holstered his weapon, spun the occupant around, and proceeded to handcuff him. Id.

Based on those facts, the Fourth Circuit held that the officer's use of force was objectively unreasonable under the Graham factors. For the first factor, it was held that the factor weighed heavily in the occupant's favor because there was no crime. Id. at 207-08 ("[T]he facts do not support a reasonable suspicion that criminal activity was afoot."). For the second factor, the Fourth Circuit found that there was no evidence that the occupant posed an immediate threat to the safety of the officer or others. Id. at 208. For the third factor, the Fourth Circuit determined that the occupant did not actively resist detention or attempt to evade detention by flight. Id. Turning to whether this right was clearly established at the time of the violation, the Fourth Circuit concluded that, as of "March 10, 2001, it would have been clear to a reasonable officer that he could not point his gun at an individual's face, jerk him from his room, and handcuff him when there was no reasonable suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention." Id.

In Betton, "a team of plain-clothed law enforcement officers armed with 'assault style rifles' used a battering ram to enter Julian Ray Betton's dwelling to execute a warrant authorizing a

18

search for marijuana and other illegal substances." Betton, 942 F.3d at 187. "The officers did not identify themselves as 'police' or otherwise announce their presence before employing the battering ram." Id. From the rear of his home, Betton heard the commotion. Id. In response, "Betton pulled a gun from his waistband and held it down at his hip." Id. Betton stated that he did not "get a chance to get to pull [the gun] up or anything" from where he held it down by his hip. Id. at 189. At that point, three officers on the scene fired a total of 29 shots at Betton, striking him nine times. Id.

Based on those facts, the Fourth Circuit held that the officer's use of force was objectively unreasonable, relying on its prior decision in Cooper v. Sheehan, 735 F.3d 153, 154 (4th Cir. 2013). In Cooper, the Fourth Circuit "concluded that a suspect, who was holding a firearm at his side on his property while investigating a noise outside his home, did not present a threat justifying the officers' use of deadly force." Betton, 942 F.3d at 191 (citing Cooper, 735 F.3d at 155, 159) (emphasis added). In discussing their holding in Cooper, the Fourth Circuit in Betton went on to explain:

> that although Cooper held a firearm, he had not made any sudden moves or threats, and had not ignored any commands given by the officers. [Cooper, 735 F.3d] at 159. Moreover, [the Fourth Circuit] stated that if the officers had identified themselves as members of law enforcement, they may have been reasonable in concluding that "a man who greets law enforcement with a firearm is

19

likely to pose a deadly threat." Id. (citing Elliott v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996) ("No citizen can fairly expect to draw a gun on police without risking tragic consequences.")). Instead, in view of the facts presented, [the Fourth Circuit] held that Cooper had a "reasonable rationale" for bearing a firearm while investigating a noise on his property and, thus, that the officers were not entitled to qualified immunity in defense of Cooper's claims against them. [Cooper, 735 F.3d] at 160 (citation omitted).

Betton, 942 F.3d at 191-92 (emphasis added). Again, relying on its 2013 decision in Cooper, the Fourth Circuit concluded "that Officer Belue's alleged conduct violated Betton's Fourth Amendment right to be free from the use of excessive force, a right that was clearly established at the time the conduct occurred." Betton, 942 F.3d at 194-95.

Neither Turmon nor Betton clearly establishes the excessive force constitutional violation alleged by Kevin in this case. In Plaintiffs' own words, Turmon involved a case where the officer "pointed a weapon [at] a passive, unarmed person and then physically seized him." ECF No. 30 at 6. Plainly, the facts in Turmon do not align with the facts as alleged in this case, as Kevin was an armed individual who had, moments before being shot at by Officers Belcher and McCarthy, displayed a raised firearm pointed in the general direction of the officers. As to Betton, and the cases it cites (including Cooper), with the level of specificity called for by Mullenix in the context of excessive force claims, Betton is simply too factually distinct, such that

20

it does not "squarely govern[]" the specific facts at issue in this case. Mullenix, 577 U.S. at 13. Whereas Betton involved an individual who merely "held a firearm by his side[,]" in this case, Kevin opened the door to his apartment while displaying a raised firearm pointed towards the officers. Betton, 942 F.3d at 194.

Officers Belcher and McCarthy are entitled to qualified immunity under the second facet of the test promulgated by the Supreme Court in Pearson, 555 U.S. at 232. Therefore, COUNT I will be dismissed with prejudice.

*2. Count II: Violation of Kevin Henderson's Fourth Amendment Rights, by Virtue of Unreasonable Detention, Against All Defendants*

The constitutional violation advanced by Kevin in COUNT II is that Officers Ojibway, Belcher, and McCarthy violated his Fourth Amendment rights by subjecting Kevin to an unreasonable detention in violation of his Fourth Amendment rights. ECF No. 22 at ¶ 51. Kevin alleges that he was handcuffed and detained in the back of a police squad car by Officers Ojibway and McCarthy. ECF No. 22 at ¶ 45. Nowhere in the First Amended Complaint does Kevin allege that he was arrested by the officers. Kevin simply offers up the conclusory statement that "[t]he officers had no probable cause to arrest or detain [him], as he was the victim's father responding to an emergency situation in his own home." ECF No. 22 at ¶ 48. However, regardless of whether the seizure of Kevin is

21

characterized as a mere detention or an arrest, COUNT II fails to sufficiently allege a constitutional violation.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." D.C. v. Wesby, 583 U.S. 48, 56 (2018) (citing Payton v. New York, 445 U.S. 573, 585 (1980)). "A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." Wesby, 583 U.S. at 56 (citing Atwater v. Lago Vista, 532 U.S. 318, 354 (2001)).

To determine whether an arrest was supported by probable cause, courts "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Establishing probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243-44 n.13 (1983). "Probable cause 'is not a high bar.'" Wesby, 583 U.S. at 57 (quoting Kaley v. United States, 571 U.S. 320, 337 (2014)).

Here, Kevin clearly alleged in the First Amended Complaint that he, "believing the person knocking was the individual who had

22

shot his daughter, and fearing for his daughter's safety and his own, partially opened the door and displayed a raised firearm in his left hand." ECF No. 22 at ¶ 18. The allegation (displaying a raised firearm) alone is sufficient to have provided Officers Ojibway and McCarthy with probable cause to place Kevin under arrest for brandishing under Virginia Code § 18.2-282, which makes it "unlawful for any person to point, hold or brandish any firearm . . . in such manner as to reasonably induce fear in the mind of another of being shot or injured." As described, Kevin's behavior would certainly induce such fear in the mind of another (here, the Officers) and it seems to have induced such fear in this case, as Officers Belcher and McCarthy discharged their firearms at Kevin in response.

Kevin argues that the Officers lacked probable cause because Virginia Code § 18.2-282 "expressly exempts persons engaged in excusable or justifiable self-defense." ECF No. 30 at 9. In support, Kevin asserts that "[a] reasonable officer would have recognized that [his] display of a firearm in response to an unannounced nighttime knock, while his daughter lay wounded inside, was a justifiable defensive response, not criminal brandishing." ECF No. 30 at 9. However, "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." Wesby, 583 U.S. at 61. Additionally, while the First Amended Complaint alleges that "[t]he officers knew or should

23

have known that Kevin Henderson was the father of the gunshot victim and that he had acted reasonably to protect his wounded daughter from what he believed was a continued threat[,]" ECF No. 22 at ¶ 47, the First Amended Complaint does not allege that Kevin or anyone else provided the officers with the information upon which that allegation depends. To the extent that Kevin is attempting to argue that the Officers subsequently learned about these potentially exculpatory facts and failed to release him within a reasonable time, such that the arrest became unconstitutional, the First Amended Complaint is devoid of any such supporting allegations.

Given that Officers Ojibway and McCarthy had probable cause to believe that Kevin had committed a crime (brandishing under Virginia Code § 18.2-282) in their presence, any warrantless arrest of Kevin that occurred was reasonable. See Wesby, 583 U.S. at 57 (noting that probable cause is not a high bar). In turn, given that Officers Ojibway and McCarthy had probable cause to arrest Kevin, to the extent that Kevin, at any point, was merely detained by Officers Ojibway and McCarthy, that detention would also be reasonable as supported by probable cause.

Accordingly, because the First Amended Complaint fails to plausibly allege that any unreasonable detention of Kevin by Officers Ojibway and McCarthy occurred, it likewise fails to plausibly allege a violation of Kevin's Fourth Amendment rights.

24

As a result, Officers Ojibway and McCarthy are entitled to qualified immunity as to Kevin's unreasonable detention claim. Additionally, the First Amended Complaint does not allege that Officer Belcher was involved in detaining Kevin such that no Fourth Amendment unreasonable detention violation has been plausibly alleged as to Officer Belcher. Therefore, COUNT II will be dismissed with prejudice as to all Defendants.

*3. Count III: Violation of Sukari Henderson's Fourth Amendment Rights, by Virtue of Excessive Force, Against Officers Belcher and McCarthy*

The constitutional violation alleged in COUNT III is that Officers Belcher and McCarthy violated Sukari's Fourth Amendment rights by subjecting her to excessive force when Officers Belcher and McCarthy discharged their firearms multiple times into and around Kevin's apartment. ECF No. 22 at ¶¶ 53-65. Sukari alleges that the officers' gunfire grazed her. ECF No. 22 at ¶ 18.

As stated above, the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. One aspect of the bundle of rights guaranteed by the Fourth Amendment is the right to be free from the use of excessive force when being seized. See Graham, 490 U.S. at 395. "Only if the plaintiff can first establish that [they have] been 'seized' within the meaning of the Fourth Amendment by means of excessive force do we proceed

25

to a determination of whether the force employed was 'objectively unreasonable' under the circumstances." Schultz v. Braga, 455 F.3d 470, 480 (4th Cir. 2006).

Here, Sukari was not seized within the meaning of the Fourth Amendment. "[A] seizure within the meaning of the Fourth Amendment always 'requires an intentional acquisition of physical control . . . .'" Id. (quoting Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989)). "[I]t does not extend to 'accidental effects' or 'unintended consequences of government action.'" Schultz, 455 F.3d at 480 (quoting Brower, 489 U.S. at 596).

Reviewing the facts as alleged in the First Amended Complaint in the light most favorable to Sukari, see Saucier, 533 U.S. at 201, there is not a single allegation that supports the conclusion that Officers Belcher and McCarthy intentionally shot Sukari. Sukari appears to rely on the statement in the First Amended Complaint that Officers Belcher and McCarthy "recklessly discharged their firearms multiple times into the apartment where [Sukari] was seeking safety." ECF No. 22 at ¶ 59. In Sukari's view, "[f]iring multiple rounds into an apartment where [Officers Belcher and McCarthy] knew a wounded person was sheltering is not analogous to a stray bullet striking a pedestrian on the street, it is the deliberate direction of lethal force into a space the officers knew to contain an injured civilian." ECF No. 30 at 10. However, the First Amended Complaint does not allege, even in

26

conclusory terms, that Officers Belcher and McCarthy (1) issued any commands to Sukari, (2) aimed their weapons at Sukari, (3) could see Sukari, or (4) knew of Sukari's specific location in the apartment. As emphasized by the Supreme Court in Torres v. Madrid, "[a] seizure requires the use of force with intent to restrain. Accidental force will not qualify." Torres, 592 U.S. 306, 317 (2021). No facts are alleged from which the interference could be drawn that Officers Belcher and McCarthy had any intent to restrain Sukari.[4]

Accordingly, because the First Amended Complaint has failed to allege that Officers Belcher and McCarthy intended to restrain Sukari by shooting her, Sukari was not seized within the meaning of the Fourth Amendment. See Schultz, 455 F.3d at 480; see also Rucker v. Harford Cnty., Md., 946 F.2d 278, 281 (4th Cir. 1991) (finding that because the victim "was not the intended object of the shooting by which he was injured," he had not been "'seized' within contemplation of the fourth amendment"). In turn, because the First Amended Complaint fails to plausibly allege that Sukari was seized within the meaning of the Fourth Amendment, it likewise fails to plausibly allege a constitutional violation. As a result,

---

[4] Additionally, to the extent that any portion of the First Amended Complaint could be construed to support an inference that officers Belcher and McCarthy intentionally shot Sukari, such an inference would be blatantly contradicted by the BWC footage and thus not credited.

27

Officers Belcher and McCarthy are entitled to qualified immunity as to Sukari's excessive force claim. Therefore, COUNT III will be dismissed with prejudice.

**4. *Count IV: Violation of Sukari Henderson's Fourteenth Amendment Rights, by Virtue of Denial of Her Substantive Due Process Rights, Against All Defendants***

In support of her Fourteenth Amendment substantive due process claim, Sukari argues that (1) the alleged conduct of Officers Belcher and McCarthy in discharging their firearms into the apartment door was "unjustifiable by any government interest, and so egregious and outrageous that it may fairly be said to shock the contemporary conscience" and (2) Officer Ojibway "acted with deliberate indifference to the known risk that his conduct would cause serious harm to Plaintiff Sukari Henderson and the other occupants of the apartment, demonstrating a degree of recklessness that rises to the conscience-shocking level required to establish a substantive due process violation." ECF No. 22 at ¶¶ 73-75.

To establish a substantive due process violation under the Fourteenth Amendment, a plaintiff must plausibly plead that a defendant's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Dean ex rel. Harkness v. McKinney, 976 F.3d 407, 413 (4th Cir. 2020) (quoting Terrell v. Larson, 396 F.3d 975, 978 (8th Cir. 2005)). "To be conscience shocking, a defendant's behavior must lack 'any

28

reasonable justification in the service of a legitimate governmental objective.'" Washington v. Hous. Auth. of the City of Columbia, 58 F.4th 170, 177 (4th Cir. 2023) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).

Although "the measure of what is conscience-shocking is no calibrated yard stick," it does "'point the way.'" Lewis, 523 U.S. at 847 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Supreme Court in Lewis described a 'culpability spectrum' along which behavior may support a substantive due process claim." Dean, 976 F.3d at 414 (quoting Lewis, 523 U.S. at 848-49). "On one end of the spectrum is 'conduct intended to injure that is in some way unjustifiable by any government interest.'" Washington, 58 F.4th at 177 (quoting Lewis, 523 U.S. at 849). "Such conduct most likely rises to the conscience-shocking level." Washington, 58 F.4th at 177 (citing Lewis, 523 U.S. at 849). "On the other end is 'negligently inflicted harm which is categorically beneath the threshold of constitutional due process' conduct." Washington, 58 F.4th at 177-78 (citing Lewis, 523 U.S. at 849).

"But conduct falling in between those two poles—deliberate-indifference conduct which is more than negligence but less than intentional harm—presents a closer call." Washington, 58 F.4th at 178. "[D]eliberate indifference is 'an intermediate level of culpability' that can, if proven, also establish a due process violation." Dean, 976 F.3d at 415 (citing Lewis, 523 U.S. at 848–

29

49). The deliberate indifference standard "is sensibly employed only when actual deliberation is practical." Dean, 976 F.3d at 415 (quoting Lewis, 523 U.S. at 851). Therefore, the deliberate indifference standard is only employed where the official has the "luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Dean, 976 F.3d at 415 (quoting Lewis, 523 U.S. at 853) (alteration in original).

"Ultimately, the applicable standard of culpability for a substantive-due-process claim—either 'intent to harm' or 'deliberate indifference'—depends on 'an exact analysis of the context and circumstances' of the case." Washington, 58 F.4th at 178 (quoting Dean, 976 F.3d at 414).

### i. Conduct of Officers Belcher and McCarthy

Under this legal framework, and viewing the facts in the light most favorable to Sukari, intent to harm is the correct standard to measure the conduct of Officers Belcher and McCarthy. After Officer Ojibway knocked and stepped away from the doorway, Kevin opened the door and displayed a raised firearm in his left hand. ECF No. 22 at ¶¶ 16-17. Suddenly faced with an individual who displayed a firearm toward police officers, Officers Belcher and McCarthy found themselves in the sort of emergency, split-second

30

decision scenarios that provided them no time to deliberate or reflect. Dean, 976 F.3d at 415.

As stated above, the BWC footage clearly demonstrates that Officers Belcher and McCarthy discharged their firearms with the intent to subdue only Kevin, not Sukari or any other occupants of 623 Shawn Court. In fact, the BWC footage clearly shows that the only individual the officers saw was Kevin; the officers had no specific knowledge as to the precise location of Sukari or any other occupants of 623 Shawn Court. Therefore, Officers Belcher and McCarthy lacked the requisite "intent[] to injure" needed to establish a substantive due process violation under the Fourteenth Amendment. Washington, 58 F.4th at 177 (quoting Lewis, 523 U.S. at 849). Additionally, the conduct of Officers Belcher and McCarthy was not "unjustifiable by any government interest." Washington, 58 F.4th at 177 (quoting Lewis, 523 U.S. at 849). The present danger posed by Kevin, who had just opened the door with a raised firearm pointed in the officers' direction, provided a legitimate justification for the actions of Officers Belcher and McCarthy. Moreover, given the exigencies of the situation, any alleged accidental shooting of Sukari would not constitute the kind of oppressive abuse of governmental power against which substantive due process gives protection. See Rucker, 946 F.2d at 282.

For these reasons, seeing as how the actions of Officers Belcher and McCarthy were not conscience shocking, Sukari's

31

substantive due process claim against Officers Belcher and McCarthy must fail. Accordingly, COUNT IV will be dismissed as to Officers Belcher and McCarthy.

*ii. Conduct of Officer Ojibway*

Under this legal framework, and viewing the facts in the light most favorable to Sukari, deliberate indifference is the appropriate standard to evaluate the conduct of Officer Ojibway. "To prove deliberate indifference, a plaintiff must show 'that the defendant subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk.'" Washington, 58 F.4th at 179 (quoting Dean, 976 F.3d at 416). "A defendant's subjective knowledge of the risk may be inferred from circumstantial evidence." Dean, 976 F.3d at 416. "A plaintiff may also show subjective knowledge in a due-process claim 'from the very fact that the risk was obvious.'" Washington, 58 F.4th at 179 (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)).

Sukari, in support of her substantive due process claim, states (1) that "Defendant Ojibway approached the apartment and knocked loudly without announcing that he was a police officer, creating the conditions for a foreseeable and dangerous confrontation at the home of a gunshot victim's family" and (2) that "Defendant Ojibway acted with deliberate indifference to the known risk that his conduct would cause serious harm to Plaintiff

32

Sukari Henderson and the other occupants of the apartment, demonstrating a degree of recklessness that rises to the conscience-shocking level required to establish a substantive due process violation." ECF No. 22 at ¶¶ 70-71, 75. However, these conclusory allegations, without more, are insufficient to support Sukari's substantive due process claim against Officer Ojibway.

The First Amended Complaint does not allege facts sufficient to support that Officer Ojibway subjectively recognized that there would be a substantial risk of harm associated with his loudly knocking on Kevin's door without announcing that he was a police officer. Even assuming that Officer Ojibway knew and understood that he had been "dispatched to the location of a female gunshot victim who had fled to her father's apartment at 623 Shawn Court[,]" ECF No. 22 at ¶ 70, that factual scenario would not naturally lead one to believe that the choice to knock on the father's door without announcing that he was an officer would have led to the father opening the door with a raised firearm. Nor is this the type of risk that is so obvious that subjective knowledge may be inferred. For these reasons, the actions of Officer Ojibway did not rise to the level of deliberate indifference. In turn, Sukari's substantive due process claim against Officer Ojibway must fail. Therefore, COUNT IV will be dismissed as to Officer Ojibway.

33

**B. Count V: State Law Claim for Gross Negligence on Behalf of Sukari Henderson Against All Defendants**

While Plaintiffs allege that this Court has supplemental jurisdiction over the state law claim (COUNT V) pursuant to 28 U.S.C. § 1367, the existence of supplemental jurisdiction does not require the Court to exercise it. Rather, under § 1367(c), a district court may, in its discretion, decline to exercise supplemental jurisdiction once all claims over which it has original jurisdiction have been dismissed. "Although a federal court has discretion to assert pendent jurisdiction over state claims even when no federal claims remain, 'certainly if the federal claims are dismissed before trial the state claims should be dismissed' without prejudice . . . .'" Alexandria Resident Council, Inc. v. Alexandria Redevelopment & Hous. Auth., 11 F. App'x 283, 287 (4th Cir. 2001) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)) (internal citations omitted) (cleaned up); see also Wentzka v. Gellman, 991 F.2d 423, 425 (7th Cir. 1993) (remanding case for dismissal of state claims without prejudice and explaining that "where a federal claim drops out before trial, a district court should not retain the state claims absent extraordinary circumstances"). Accordingly, because all federal claims in this matter (COUNTS I through IV) will be dismissed at the outset of the litigation, the Court declines to

34

exercise supplemental jurisdiction over the remaining state law claim (COUNT V) and will dismiss that claim *without prejudice*.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (ECF No. 26) was granted by ORDER (ECF No. 61). In turn, the Court dismissed COUNTS I through IV (the federal claims) with prejudice, and COUNT V (the state law "gross negligence" claim) *without prejudice*.

                                   /s/     *REP*
                                   _____
                                   Robert E. Payne
                                   Senior United States District Judge

Richmond, Virginia
Date: August 10, 2026